**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JERMAINE HARRIS, as Independent Administrator of the ESTATE OF LEE HARRIS, | ) ) ) | Case No. 1:23-cv-14220 |
| | ) | Judge Joan H. Lefkow |
| *Plaintiff*, | ) ) | |
| *v.* | ) ) | |
| RICHARD ZULEY, JAMES WARD, JOHN McHUGH, THOMAS KEANE, JAMES CRADICK, TERRY O'CONNOR, MICHAEL WICK, WAYNE JOHNSON, ANTHONY VILLARDITA, GERI YANOW, as Special Representative of the ESTATES of WILLIAM CALLAGHAN and THOMAS BLOMSTRAND, the CITY OF CHICAGO, COOK COUNTY STATE'S ATTORNEY CHERYL CESARIO, and COOK COUNTY, | ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| *Defendants*. | ) ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Jermaine Harris, as Independent Administrator of the Estate of Lee Harris, by his attorneys, Loevy & Loevy and Jennifer Blagg, complains of Defendants Richard Zuley, James Ward, John McHugh, Thomas Keane, James Cradick, Terry O'Connor, Michael Wick, Wayne Johnson, Anthony Villardita, Geri Yanow, as Special Representative of the Estates of William Callaghan and Thomas Blomstrand, the City of Chicago, Cook County Assistant State's Attorney Cheryl Cesario, Cook County, and as-yet unknown employees of the City of Chicago and Cook County, and states as follows:

## INTRODUCTION

1.  Because he trusted the Defendants, and the Defendants intentionally abused that trust, Lee Harris spent thirty-three years in prison for a crime he did not commit.

2.  Mr. Harris, who organized girls' softball games, brought the Black Olympics to the Cabrini Green neighborhood, and championed gang violence prevention initiatives, was a beloved figure in his community.

3.  As a result of his community work, Mr. Harris developed friendships with the Chicago Police Department officers assigned to his neighborhood. Following the high-profile murder of Dana Feitler in the Gold Coast neighborhood, Defendants systematically abused Mr. Harris's trust and friendship, leading to his wrongful conviction.

4.  Over a period of months, and throughout dozens of interrogations, Defendants repeatedly manipulated Mr. Harris by promising him a life-changing financial reward, controlling his and his family's access to safe housing, and otherwise placing him under enormous psychological pressure.

5.  As a result of this overwhelming coercion, Mr. Harris falsely implicated himself in the murder of Ms. Feitler. That coerced confession led to his wrongful conviction and thirty-three-year incarceration before he was finally exonerated in 2023.

6.  Mr. Harris's false confession, like too many others in the City of Chicago, was the product of improper manipulation by Chicago Police Department officers.

7.  Not one piece of physical evidence ever connected Mr. Harris to the crime.

8.  The only evidence introduced against Mr. Harris at trial was evidence fabricated by the Defendants.

9.    Defendants, who knew Mr. Harris had nothing to do with the murder of Ms. Feitler, fabricated police reports implicating Mr. Harris, manufactured witness testimony, and suppressed critical exculpatory evidence.

10.    After over three decades of fighting for his freedom, Mr. Harris was finally exonerated. He will never recover that lost time. But he brings this lawsuit seeking justice for the harms Defendants inflicted on him and the systemic abuse that allowed his wrongful conviction to happen.

## JURISDICTION AND VENUE

11.    This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation of Lee Harris's rights secured by the United States Constitution.

12.    This court has jurisdiction over Mr. Harris's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367.

13.    Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Mr. Harris's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in his conviction.

## PARTIES

14.    Lee Harris was a resident of Illinois. He spent thirty-three years in prison for a crime he did not commit. He is now deceased. Plaintiff Jermaine Harris is Mr. Harris's son and is Independent Administrator of the Estate of Lee Harris.

15.    At all times relevant to the events described in this complaint Richard Zuley, James Ward, John McHugh, William Callaghan, Thomas Keane, James Cradick, Thomas Blomstrand, Terry O'Connor, Michael Wick, Wayne Johnson, Anthony Villardita, and other unknown law enforcement officers, were police officers employed by the Chicago Police

Department acting under the law and within the scope of their employment for the City of Chicago. Geri Yanow is the Special Representative for the Estates of William Callaghan and Thomas Blomstrand, both deceased.[1]

16.     At all relevant times, Defendants Zuley, Callaghan, Keane, Cradick, Blomstrand, O'Connor, Wick, and other unknown law enforcement officers supervised the other officers in the preceding paragraph. Acting under color of law and within the scope of their employment for the City of Chicago, they facilitated, condoned, approved, and turned a blind eye to the constitutional violations committed by the officers in the preceding paragraph.

17.     Defendants Richard Zuley, James Ward, John McHugh, William Callaghan, Thomas Keane, James Cradick, Thomas Blomstrand, Terry O'Connor, Michael Wick, Wayne Johnson, Anthony Villardita, and other unknown law enforcement officers are referred to collectively as "Defendant Officers" throughout the Complaint.

18.     At all relevant times Defendant Cheryl Cesario was an Assistant Cook County State's Attorney. She is sued for actions she undertook, in conspiracy with the Defendant Officers, in her capacities as an investigator and without probable cause to believe that Lee Harris had committed any crime.

19.     Defendant City of Chicago is a municipal corporation that is or was the employer of the above-named Defendant Officers. Each of the Defendant Officers acted during their investigation as agents or employees of the City of Chicago. The City of Chicago is liable based on *respondeat superior* for the acts of the Defendant Officers. The City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

---

[1] For ease of reference, Callaghan and Blomstrand are referred to throughout the Complaint as Defendants Callaghan and Blomstrand instead of Geri Yanow, the special representative of their estates.

20.     Defendant Cook County is a governmental entity within the State of Illinois, which provides funding for the Cook County State's Attorney's Office and was at all relevant times the employer of Defendant Cesario. Defendant Cook County is a necessary party to this lawsuit and is responsible for paying any judgment entered against Defendant Cesario.

21.     Each of the individually named defendants acted under color of law and within the scope of their employment at all times relevant to this lawsuit. Each individual Defendant is sued in his or her individual capacity.

## FACTS

### The Murder of Dana Feitler

22.     Around 2:00 a.m. on June 18, 1989, twenty-four-year-old Dana Feitler was found shot and dying in an alley in Chicago's Gold Coast neighborhood after a security guard reported hearing a gunshot and seeing men run out of the alley.

23.     Ms. Feitler's murder drew instant and intense media coverage and interest from the public.

24.     The Feitler family offered a significant reward for information related to the shooting.

### Defendants Begin to Frame Mr. Harris

25.     Mr. Harris, who was not involved in the crime in any way, first learned of Ms. Feitler's murder from Defendants Ward and McHugh, two Chicago Police Department officers he was friendly with from the neighborhood. They told him about the substantial reward for any information.

26.     Mr. Harris, who knew nothing about the shooting, told Officers Ward and McHugh as much.

27. Defendants Ward and McHugh told Mr. Harris they thought they knew who had committed the shooting.

28. Defendants Ward and McHugh, who both knew that Mr. Harris had fallen upon hard times, promised Mr. Harris that he simply had to come to Area Six and repeat the information back to other Defendant Officers to receive the reward.

**Defendant Officers Interrogate Mr. Harris**

29. Mr. Harris was taken in for interrogation by several Defendant Officers, including Defendants Zuley, Keane, and Cradick, escorted by Defendants Ward and McHugh.

30. Upon realizing that they could not corroborate the story they had forced Mr. Harris to tell, Defendants improperly pressured Mr. Harris to change his story to fit their own changing narrative of the case.

31. Mr. Harris complied and, at Defendant Officer' urging, made a new false statement to comport with the Defendant Officers' narrative.

32. This pattern continued over a period of months. Mr. Harris would meet with Defendants Ward and McHugh, who would feed him a new piece of information—given to them by the other Defendant Officers.

33. Mr. Harris would then be taken to Area Six where he would repeat whatever information he had learned from Defendants Ward and McHugh to the other Defendant Officers, including Defendants Zuley, Cradick, and Keane.

34. Defendants Ward, McHugh, Zuley, Cradick, and Keane knew that Mr. Harris did not know anything about the Feitler shooting but continued to pressure Mr. Harris to make statements by promising him the reward money.

35. And whenever Mr. Harris made a statement that was illogical or did not fit with the Defendant Officers' narrative of the crime, they pressed him to make a different statement.

36.     In addition, Defendant Officers, including Defendants Keane, Callaghan, Blomstrand, and Zuley, all repeatedly told Mr. Harris that he did not need a lawyer and reassured him that he would never be arrested, regardless of what he said.

37.     As a result of these promises, Mr. Harris continued to speak with the Defendant Officers and make coerced statements.

38.     Each of the Defendant Officers participated in the coercion of Mr. Harris and was actively involved in interrogating him.

39.     The Defendant Officers ultimately coerced around twenty ever-evolving statements from Mr. Harris. Under the circumstances described herein, the Defendant Officers were aware that they were procuring false statements but did it anyway.

40.     Defendant Officers, including Defendants Zuley, Cradick, Ward, McHugh, Johnson, Villardita, Keane, and O'Connor, routinely fabricated police reports reflecting Mr. Harris's supposed statements to include new information they learned throughout the course of their investigation.

**The Alternate Suspect**

41.     While Defendant Officers continued to press their theory of the case through their coercion of Mr. Harris, they simultaneously ignored the developing evidence against a real suspect, Ronald Grant.

42.     That evidence included an eyewitness identification, a bloody sweatshirt, and information from two witnesses that had heard Mr. Grant discuss killing Ms. Feitler.

43.     Defendant Officers, rather than pursue this obvious lead, however, continued to put pressure on Mr. Harris.

**Defendant Officers Continue to Coerce Mr. Harris**

44.     As Defendant Officers continued to coerce Mr. Harris into making ever-evolving statements, they continued to fail to corroborate those statements.

45.     Defendant Officers repeatedly pressured Mr. Harris into making specific statements and coached him on how to pass a polygraph exam, in an attempt to corroborate their narrative of the crime.

46.     The State's Attorney ultimately declined to charge anyone Mr. Harris had implicated in the Feitler murder because Mr. Harris's coerced statements were unreliable.

47.     The Defendant Officers, including Defendants Zuley, Callaghan, Blomstrand, Cradick, and Wick, began providing housing and food for Mr. Harris and his family.

48.     Defendant Callaghan repeatedly spoke with Mr. Harris, making him promises and pressuring him into making additional false statements. Defendant Callaghan also led efforts to secure housing for Mr. Harris and his family, which increased the pressure on Mr. Harris.

49.     Mr. Harris became dependent on the Defendant Officers for his family's safety, housing, and food, which was Defendants' intention.

**The Defendants Coerce Mr. Harris into Implicating Himself**

50.     Defendant Officers, including Defendants Zuley, Keane, Blomstrand, Ward, McHugh, and Wick, were in near-daily contact with Mr. Harris, pressuring him into making additional statements and promising him the reward.

51.     Defendant Officers also repeatedly held Mr. Harris's precarious housing status over his head, stating that he could only continue to live on their dime if he made statements that were helpful to the Defendant Officers, knowing full well that Mr. Harris and his family were unable to return to Cabrini Green.

52.     Several months into the investigation Thomas Keane and Defendant James Cradick picked Mr. Harris up at his home and brought him into Area Six.

53.     Mr. Harris agreed to speak with Defendant Officers only because they threatened to charge him with a crime if he did not. Defendant Officers also told Mr. Harris he would be unable to leave the station if he did not give them a helpful statement.

54.     Defendant Officers also threatened Mr. Harris with eviction.

55.     Mr. Harris cried as Defendant Officers berated him, pressuring him to change his story yet again. Eventually, the Defendant Officers improperly overcame Mr. Harris's will.

56.     Under police pressure and coercion, Mr. Harris gave yet another statement, further implicating himself in the Feitler crime to Defendant Officers, including Defendant Zuley.

57.     Thirteen days later, Defendant Officers came to arrest Mr. Harris. He arrived at Area Six in the early evening hours.

58.     Defendants, including Defendant Zuley, and Defendant Cesario, rehearsed Mr. Harris's false statement with him for several hours, without Mr. Harris's lawyer present, continually promising him the reward. The Defendants were aware Mr. Harris had a lawyer, and had his contact information, but denied Mr. Harris representation as a means of coercion.

59.     After Defendants were satisfied by Mr. Harris's rehearsal, Mr. Harris gave another oral statement. Mr. Harris, under enormous pressure following months of repeated coercion, falsely confessed that he went into the alleyway to rob Ms. Feitler. This statement was false and was the sole product of undue coercion.

60.     Only after Mr. Harris had given this oral statement was Mr. Harris permitted to speak with his lawyer, who arrived just before dawn.

61.    Mr. Harris was forced to continue talking to Defendant Officers until the next day, with no sleep.

62.    Mr. Harris refused to give a written statement. Mr. Harris only gave the oral statement because the Defendants told him what to say and promised he would be rewarded if he said it—as they had for months.

**Mr. Harris's Wrongful Prosecution and Conviction**

63.    Following this coerced "confession," Defendant Officers fabricated additional evidence to support their false and unsupported case against Mr. Harris.

64.    Defendant Officers forced Mr. Harris to participate in a lineup, viewed by Diana Sepielli.

65.    Defendant O'Connor, who drove Ms. Sepielli home, fabricated a report stating that Ms. Sepielli was positive Mr. Harris was one of the men she had seen. This was untrue.

66.    At trial, she denied being certain that she had ever seen Mr. Harris with Ms. Feitler that night and denied ever making a comment to that effect to Defendant O'Connor.

67.    Indeed, Ms. Sepielli, while preparing her trial testimony, twice identified a photo of another man as one of the men walking with Ms. Feitler and said the man in the photo was the person she had mistakenly said was Mr. Harris.

68.    Defendant Officers never disclosed this information to the defense.

69.    Because Defendant Officers only had a tentative identification and Mr. Harris's convoluted, ever-evolving statements to support their case, Defendant Officers constructed a jailhouse snitch—David Toles, to testify against Mr. Harris at trial.

70.    Defendants Keane and Zuley approached Mr. Toles while he was in jail.

71.    Mr. Toles, who had a significant history of giving false evidence in exchange for benefits from law enforcement, was forced by Defendants Keane and Zuley to say that

Mr. Harris told Mr. Toles that he was responsible for the Feitler murder. This was a lie, and Defendant Officers knew it.

72.     Mr. Toles had previously been paid for work as a police informant in other cases, but Defendants did not turn over that information to Mr. Harris's criminal defense attorneys.

73.     Defendant Officers instructed Mr. Toles for months leading up to his testimony at Mr. Harris's criminal trial to make sure he stuck to their fabricated script.

74.     As a reward for his participation in the framing of Mr. Harris, Mr. Toles was housed in a special witness quarters and given benefits other prisoners did not receive.  Mr. Toles was subsequently released from prison a few weeks after his sentencing.

75.     Mr. Toles later recanted his testimony against Mr. Harris and filed a complaint against Defendant Zuley.

76.     Defendant Officers fabricated other evidence, including police reports, to cover up their misconduct, and they provided those false reports and other evidence to state prosecutors.

77.     Defendant Officers fabricated evidence became the basis for charging and prosecuting Mr. Harris.

### Mr. Harris's Wrongful Prosecution

78.     In 1992, as a result of Defendants' misconduct and based on the false evidence described in this complaint, Mr. Harris was prosecuted for Ms. Feitler's murder.

79.     No physical evidence ever connected him to the crime.

80.     None of the other men implicated in Mr. Harris's statements were ever charged for their supposed involvement.

81. Defendants concealed the repeated coercion, inducements, and promises they used over months and dozens of interrogations to force Mr. Harris to implicate himself in Ms. Feitler's murder.

82. Defendants also hid the fact that the information in all of Mr. Harris's statements had been fed to him by the Defendants.

83. Defendants hid their fabrication of evidence from trial prosecutors and from Mr. Harris's defense team before his trial, and they suppressed all evidence that exonerated Mr. Harris.

84. Defendants gave false statements to state prosecutors and Defendants McHugh, Ward, Blomstrand, Cradick, Zuley, Cesario, Johnson, and Keane provided false testimony at Mr. Harris's trial.

85. The only evidence introduced at Mr. Harris's trial implicating him in the murder was the material Defendants fabricated and coerced.

86. Because of Defendants' false and manufactured evidence, Mr. Harris was wrongfully convicted and spent thirty-three years in prison. He was completely innocent, as Defendants well knew.

87. But for the Defendants' misconduct, Mr. Harris would have been neither prosecuted nor convicted.

**Mr. Harris's Exoneration**

88. After his conviction, Mr. Harris fought hard to prove his innocence. He appealed his conviction and filed a pro-se motion for post-conviction relief. He also asked for evidence to undergo DNA testing but critical exculpatory evidence in the Chicago Police Department's possession was conveniently lost.

12

89.     In 2016, Mr. Harris hired private counsel. Mr. Harris then filed another petition for post-conviction relief.

90.     The petition detailed Defendants' fabrication and suppression of evidence, as well as their coercion of Mr. Harris.

91.     The petition, and a supplement filed in support, detailed, among other things, that Defendants: fabricated their reports of Mr. Harris's statements to better reflect the evolving investigation, suppressed evidence regarding Mr. Toles's role as a paid informant, and failed to disclose other exculpatory information to the defense—including Ms. Sepielli's manipulated tentative identification.

92.     The petition also established a pattern and practice of Defendant Officers, including Zuley and McHugh, coercing and torturing witnesses to secure wrongful convictions.

93.     Mr. Harris's conviction and sentence were vacated on March 16, 2023.

94.     After thirty-three years in prison, Mr. Harris was finally freed.

**Policy and Practice of Wrongfully Convicting Innocent People**

95.     The Defendants' misconduct in this case was no isolated occurrence.

96.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of incidents like the one Mr. Harris endured.

97.     Since 1986, at least 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes they did not commit.

98.     These cases include many in which Chicago police officers used the same tactics Defendants employed against Mr. Harris in this case, including fabricating evidence, concealing

13

exculpatory evidence, manipulating eyewitness testimony, abusing, and coercing suspects into falsely implicating themselves, and using other tactics to secure arrest, prosecution, and conviction without probable cause and without regard for the person's actual guilt or innocence.

99.     At all relevant times, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

100.     Consistent with municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Mr. Harris.

101.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of, inter alia, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

102.     The policies and practices of suppressing exculpatory and/or impeaching evidence at issue in *Rivera*, *Fields*, and *Jones,* applied throughout the 1980s through the 2000s, including at the time of the Feitler murder investigation at issue here.

103.     The policy and practice of suppressing exculpatory and/or impeaching evidence was alive and well at all relevant times, including at the Area Six Detective Division during the investigation into the Feitler murder.

104.     In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

105.     In addition, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

106.     Before and during the period in which Mr. Harris was falsely charged with and convicted of the Feitler murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

107.     As a result, Chicago police detectives and their supervisors were able to engage in rampant misconduct with impunity, and as a result caused scores of wrongful convictions just in Area Six, where Defendants were assigned, and hundreds more City-wide.

108.    The City of Chicago and its police department also failed in the years prior to Mr. Harris's conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.  The conduct of live lineup, photographic, and other identification procedures;

b.  The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

c.  The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

d.  The risks of wrongful conviction and the steps police officers should take to minimize risks;

e.  The risks of engaging in tunnel vision during investigation;

f.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

109.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Mr. Harris's wrongful conviction and his injuries.

110.    The Chicago Police Department also failed to appropriately supervise its officers.

111. The United States Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

112. On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

113. In addition, the DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the DOJ found that the City failed to investigate

17

nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

114. Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City recommended disciplinary action in fewer than 4% of cases in which it paid settlements to plaintiffs alleging violation of their civil rights and did not conduct any disciplinary investigations in over half of those cases.

115. Since before Mr. Harris's arrest and continuing for years afterward, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

116. Charlie Beck, the former interim superintendent of the Chicago Police Department, acknowledged the existence of this code of silence.

117. As a result of the City of Chicago's established practices, Defendant Officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result

18

of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens. This belief extends to the Defendants in this case.

118.    The Code of Silence is so pervasive that, as in this case, it often involves other law enforcement officers and agencies, like the Felony Review Unit of the Cook County State's Attorney's Office.

119.    Defendant Officers engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

120.    Part and parcel with this history of fostering egregious misconduct, the Chicago Police Department has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from witnesses and suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

121.    This history goes back at minimum to the 1980s and has continued well into the 2000s and includes the conduct of infamous Chicago Police Detectives including Jon Burge, Michael McDermott, Kenneth Boudreau, Kriston Kato, Reynaldo Guevara, and many others. In many cases, these and other Chicago Police officers have been the subject of judicial determinations that they engaged in a pattern and practice of using physical and psychological abuse to coerce false confessions from suspects, and/or the exonerations resulted from DNA evidence proving the confessions were false, and/or the exonerations resulted in the State of Illinois certifying that the individual was innocent despite an earlier false confession.

122.    The wrongful conviction of innocent persons who gave coerced and false confessions include numerous cases in which Chicago Police Detectives used the very same tactics that the Defendants employed against Lee Harris in this case. These tactics include: (a)

psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants; (c) the fabrication of confessions; (d) the concealment of exculpatory information; (e) false promises of monetary reward and/or leniency in exchange for "cooperation" in the form of a confession; and (f) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, without regard to their actual guilt.

123.    The policy and practice of the City of Chicago is so well-established that it has important ramifications for misconduct in the Felony Review Unit ("FRU") of the Cook County State's Attorney's Office, which often includes young attorneys who are part of the investigation in CPD Detective Divisions and work alongside police officers. As a consequence, the misconduct and coordination between the Defendant Officers and Defendant Cesario during the investigation of the murder of Ms. Feitler was not unique or isolated. Instead, members of the FRU as a matter of widespread custom and practice, routinely facilitate and cooperate in fabricating and coercing confessions from suspects in the custody of the Chicago Police Department and then fail to disclose exculpatory evidence to attorneys in their own Trial Division.

124.    The manner in which the CCSAO staffs the Felony Review Unit also reinforces systemic and symbiotic misconduct. In particular, the CCSAO typically staffs the FRU with new, young prosecutors. Those prosecutors are quickly taught that they have to be "team players" and go along with the actions of the CPD Detectives, even if their actions involve misconduct. The FRU attorneys know that their time in the unit has the potential to "make or break" their careers, giving them an incentive to go along with the Detectives, because performance in the FRU is a steppingstone to getting to the Trial Division of the SAO.

125.     Then, by the time young prosecutors get into the Trial Division, who need to secure convictions to get promoted, prosecutors have little opportunity or incentive expose police misconduct, even when they see it, because doing so will make police officers unwilling to serve as witnesses in their cases because they are not "team players," and would potentially expose their own misconduct.

126.     The City's failure to train, supervise, and discipline its officers, including Defendants Richard Zuley, James Ward, John McHugh, William Callaghan, Thomas Keane, James Cradick, Thomas Blomstrand, Terry O'Connor, Michael Wick, Wayne Johnson, Anthony Villardita, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Mr. Harris in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

127.     Defendant Zuley has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case.

128.     Examples of Defendant Zuley's misconduct include:

     a.  Defendant Zuley handcuffed Benita Johnson to a wall for over twenty-four hours and threatened her—saying that she would never see her children again and that she would be put to death—to force her to falsely implicate herself and her ex-boyfriend in a homicide case. Defendant Zuley additionally fabricated evidence against Johnson and her ex-boyfriend, Andre Griggs (see below) by forcing an unreliable informant to corroborate their coerced false confessions. That same informant, Eugene Hawes, was later found to be unreliable by a Cook County Judge.

b. Defendant Zuley handcuffed Andre Griggs to a wall for thirty hours and forced him to suffer from debilitating narcotics withdrawal in order to coerce him into signing a false confession. Defendant Zuley additionally fabricated evidence against Griggs by knowingly presenting false testimony from an unreliable informant, Eugene Hawes (see above).

c. Defendant Zuley shackled Lathierial Boyd for hours and used racial slurs during his interrogation. Defendant Zuley also failed to disclose exculpatory information, planted evidence, and pressured an unreliable informant in order to secure a confession against Mr. Boyd.

d. Defendant Zuley kept Carl Reed, who was illiterate and suffered from a substantial intellectual disability, in custody and shackled to the wall for over fifty-five hours. Defendant Zuley physically abused Mr. Reed and threatened him with additional physical violence. Defendant Zuley denied Mr. Reed critical medication for his diabetes and forced Mr. Reed to sign a false confession he could not read—Mr. Reed was told he was signing release papers.

e. Defendant Zuley also participated in the coerced false confession of David Wright. Defendant Zuley put a gun to Mr. Wright's head while he was asleep at home and arrested him. He further participated in the coercion of Mr. Wright, including presenting Mr. Wright with written documents he could not read and threatening his family.

f. Defendants Zuley and Callaghan caused Anthony Garrett to be beaten with a rubber hose until he falsely confessed to another high-profile murder in

Cabrini-Green. In that same investigation Defendants Zuley and Callaghan coerced multiple witnesses to provide false testimony against Garrett.

g. Defendant Zuley, during the investigation into the Brown's Chicken murders, used a discredited informant to push his narrative of the case. As a result of his inappropriate use of an informant, he was kicked off the investigation task force. He then leaked confidential information regarding the investigation to the media, lied about doing so to his superiors at the Chicago Police Department, and was suspended as a result.

h. Defendant Zuley is also known internationally for his role as the mastermind behind the interrogation plan and subsequent physical and psychological torture of Mohamedou Slahi at Guantanamo Bay. Defendant Zuley subjected Mr. Slahi to sexual assaults, sensory deprivation, physical abuse and torture, and made violent rape threats against his mother. The conviction obtained from Mr. Slahi was determined to be worthless as a result of Defendant Zuley's masterminded brutal interrogation techniques.

129. Defendants Ward and McHugh also have a long history of engaging in precisely the kind of misconduct at issue in this case. Defendants Ward and McHugh were involved in interrogations that led to the wrongful convictions of four teenagers from Cabrini Green for the 1986 murder of Lori Roscetti.

130. And Defendant O'Connor actively participated in the investigation that led to the wrongful conviction of Daniel Taylor.

131. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs

despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Harris's ongoing injuries.

132.     The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violation of constitutional rights described herein.

## Mr. Harris's Damages

133.     Mr. Harris spent thirty-three years of his life imprisoned for a crime he did not commit.

134.     For those thirty-three years, Mr. Harris was threatened and attacked by guards and inmates, suffered physical injuries, and constantly feared for his life.

135.     Additionally, the emotional pain and suffering caused by the Defendants' misconduct has been, and continues to be, substantial.

136.     Because of Defendants' misconduct, Mr. Harris was taken away from and missed out on the lives of his family and friends. While he was incarcerated, his wife died from a drug addiction exacerbated by her eviction from the apartment the Chicago Police Department had forced her to live in during their investigation of the Feitler murder.

137.     Mr. Harris was robbed of opportunities to pursue his interests and passions, build relationships, and continue the community work that provided his life with meaning. Instead, he was forced to spend over three decades in prison, where his life was in constant danger.

138.     Mr. Harris has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

139.     Mr. Harris lived in constant emotional anguish, never knowing whether the truth would ever come out and whether he would ever be exonerated.

140.     In addition to the severe trauma of wrongful imprisonment and Mr. Harris's loss of liberty, Defendants' misconduct continues to cause Mr. Harris extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Mr. Harris has also suffered profound and continuing reputational harm as a result of being labeled a murderer.

## COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

141.     Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

142.     As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Mr. Harris of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

143.     In the manner described more fully above, Defendants fabricated evidence and statements falsely implicating Mr. Harris in the crime.

144.     Defendants knew this evidence was false.

145.     Defendants obtained Mr. Harris's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Mr. Harris during his criminal case.

146.     In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Mr. Harris, and Mr. Harris's criminal defense attorneys, including evidence that

Defendants had manufactured false evidence, thereby misleading and misdirecting the criminal prosecution of Mr. Harris.

147.    In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Mr. Harris.

148.    The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Mr. Harris and the deprivation of Mr. Harris's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Mr. Harris could not have and would not have been pursued.

149.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Harris's clear innocence.

150.    As a result of Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

151.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT II
### 42 U.S.C. § 1983 – Coerced and False Confession
### (Fifth and Fourteenth Amendments)

152.    Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

153.    In the manner described more fully above, Defendants, acting as investigators and without probable cause to suspect Mr. Harris of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the

scope of their employment, forced Mr. Harris to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

154.    In addition, Defendants, acting as investigators and without probable cause to suspect Mr. Harris of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used extreme psychological coercion in order to force Mr. Harris to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Mr. Harris, and it was not supported by any conceivable governmental interest.

155.    In addition, the Defendants, acting as investigators and without probable cause to suspect Mr. Harris of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated false statements, each of which was attributed to Mr. Harris and used against him in his criminal proceedings, in violation of his right to a fair trial protected by the Fourteenth Amendment.

156.    Specifically, Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Mr. Harris, using psychological coercion, which overbore his will and resulted in him making involuntary statements implicating himself in the murder of Ms. Feitler.

157.    Those false incriminating statements were wholly fabricated by the Defendants and attributed to Mr. Harris. Those false incriminating statements were used against Mr. Harris to his detriment throughout his criminal case. They were the reason that he was prosecuted and convicted of the Feitler murder.

158.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Mr. Harris's clear innocence.

159.    As a result of Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

160.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

161.    Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

162.    In the manner described above, Defendants, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Mr. Harris of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against him without any probable cause for doing so and in spite of the fact that they knew he was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

163.    In so doing, these Defendants maliciously prosecuted Mr. Harris and caused him to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

164.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Harris's clear innocence.

28

165.     As a result of Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

166.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV
### 42 U.S.C. § 1983 –Failure to Intervene

167.     Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

168.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Mr. Harris's constitutional rights, even though they had the duty and the opportunity to do so.

169.     These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

170.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Harris's clear innocence.

171.     As a result of Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

172.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT V**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

173.    Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

174.    In the manner described more fully above, Defendants, acting in concert with one another and other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Mr. Harris for the Feitler murder, regardless of his guilt or innocence, and thereby to deprive him of his constitutional rights.

175.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Harris of these rights.

176.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

177.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Harris's clear innocence.

178.    As a result of Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

179.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VI**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

180.    Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

181.     As described in detail above, the City of Chicago is liable for the violation of Mr. Harris's constitutional rights because his injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

182.     At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

183.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

184.     In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Lee Harris, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on

fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

185.   Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

186.   In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed

to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

187. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Mr. Harris.

188. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

189. As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

190. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Mr. Harris were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

191. Mr. Harris's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII
### State Law Claim – Malicious Prosecution

192.    Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

193.    In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Mr. Harris of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against him without any probable cause for doing so.

194.    In so doing, the Defendants caused Mr. Harris to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

195.    The judicial proceedings were terminated in Mr. Harris's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in 2023.

196.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Mr. Harris's clear innocence.

197.    As a result of the Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

198.    Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

199.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were

undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause severe emotional distress to Mr. Harris, as is more fully alleged above.

200.    As a result of the Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Willful and Wanton Conduct/Aggravated Negligence

201.    Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

202.    At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Feitler murder investigation.

203.    Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Mr. Harris's rights.

204.    As a result of the Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – Civil Conspiracy

205.    Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

206.    As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. Harris for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In

addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Harris of these rights.

207.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

208.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Mr. Harris and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

209.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Mr. Harris's clear innocence.

210.     As a result of the Defendants' misconduct described in this Count, Mr. Harris suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI
### State Law Claim – *Respondeat Superior*

211.     Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

212.     While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

213.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII
### State Law Claim - Indemnification

214.     Mr. Harris incorporates each paragraph of this complaint as if fully restated here.

215.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

216.    The Defendant Officers were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

217.    Defendant City of Chicago is responsible to pay any judgment entered against the Defendant Officers.

218.    Defendant Cesario was an employee, member, and/or agent of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

219.    Defendant Cook County is responsible for paying any judgment entered against Defendant Cesario.

WHEREFORE, Plaintiff JERMAINE HARRIS, as Independent Administrator of the ESTATE OF LEE HARRIS, respectfully requests that this Court enter a judgment in his favor and against Defendants RICHARD ZULEY, JAMES WARD, JOHN McHUGH, THOMAS KEANE, JAMES CRADICK,  TERRY O'CONNOR,  MICHAEL WICK, WAYNE JOHNSON, ANTHONY VILLARDITA, GERI YANOW, as the Special Representative of the ESTATES OF WILLAM CALLAGHAN and THOMAS BLOMSTRAND, the CITY OF CHICAGO, CHERYL CESARIO, and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, JERMAINE HARRIS, as the Independent Administrator of the ESTATE of

LEE HARRIS, hereby demands a trial by jury pursuant to Federal Rules of Procedure 38(b) on

all issues so triable.

**LEE HARRIS**

BY:     /s/ Jordan Poole
        *One of Plaintiff's Attorneys*

Jon Loevy
Jordan Poole
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
poole@loevy.com

Jennifer Blagg
1509 W. Berwyn Ave. Suite 201E
Chicago, Illinois 60640
(773) 859-0081
jennifer@blagglaw.net